IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MYLIQUE MCFADDEN,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT GREENVILLE

———————————

## OPENING BRIEF OF APPELLANT

———————————

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, SC 29606
(864) 760-4000
Josh@KendrickLeonard.com

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... ii

      I.    STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ...................................................................................... 1

  A.  BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT ................................................................................. 1

  B.  BASIS FOR JURISDICTION IN THE COURT OF APPEALS ............. 1

II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................ 2

III.   STATEMENT OF THE CASE ................................................................. 2

IV.   SUMMARY OF THE ARGUMENT ....................................................... 5

V.  ARGUMENT ............................................................................................ 7

  1.  THE DISTRICT COURT VIOLATED McFADDEN'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY IMPROPERLY LIMITING HIS CROSS-EXAMINATION OF A COOPERATING WITNESS. ...................................................................................... 7

    Standard of Review ............................................................................. 7

    Argument ............................................................................................ 8

  2.  THE EVIDENCE AGAINST McFADDEN WAS INSUFFICIENT TO CONVICT HIM ON COUNT 1 BECAUSE THE GOVERNMENT FAILED TO PROVE A DISTRIBUTION OF FENTANYL TO THE DECEDENT OR THAT FENTANYL WAS THE BUT-FOR CAUSE OF THE DEATH. ........ 14

    Standard of Review ........................................................................... 14

    Argument .......................................................................................... 14

      1.  The jury could have only found fentanyl the but-for cause of death through speculation. ........................................................... 14

      2.  The jury could have only found McFadden distributed fentanyl to Barber through speculation. ........................................................ 19

  3.  THE GOVERNMENT'S EXPERT WITNESS ON NARCOTICS TRAFFICKING WAS NOT RELIABLE AND SHOULD NOT HAVE BEEN ADMITTED. ...................................................................................... 20

    Standard of Review ........................................................................... 20

    Argument .......................................................................................... 20

CONCLUSION ............................................................................................ 30

STATEMENT REGARDING ORAL ARGUMENT ..................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Call v. United States, 265 F.2d 167 (4th Cir. 1959)* ................................... 19

*Davis v. Alaska, 415 U.S. 308 (1974)* ................................................ 10, 12

*Delaware v. Van Arsdall, 475 U.S. 673 (1986)* ........................................ 10

*Hoover v. Maryland, 714 F.2d 301 (4th Cir. 1983)* .................................. 11

*Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc., 892 F.3d 624 (4th Cir. 2018)* ..................................................................................... 20

*United States v. Ambers, 85 F.3d 173 (4th Cir. 1996)* ........................... 7, 11

*United States v. Burrage, 571 U.S. 204 (2014)* ...................................... 6, 14

*United States v. Cropp, 127 F.3d 354 (4th Cir. 1997)* .............................. 12

*United States v. Garcia, 752 F.3d 382 (4th Cir. 2014)* ......................... 28, 29

*United States v. Johnson, 617 F.3d 286 (4th Cir. 2010)* ....................... 26, 27

*United States v. Reed, 780 F.3d 260 (4th Cir. 2015)* ................................. 7

*United States v. Savage, 885 F.3d 212 (4th Cir. 2018)* ............................ 14

*United States v. Scheetz, 293 F.3d 175 (4th Cir. 2002)* ............................ 12

*United States v. Williams, 130 F.4th 177 (4th Cir. 2025)* ......................... 14

*United States v. Wilson, 484 F.3d 267 (4th Cir. 2007)* .............................. 27

## Statutes

21 U.S.C. § 841 ................................................................................... 1

28 U.S.C. § 1291 ................................................................................ 1

## Other Authorities

Fed. R. Crim. P. 29.......................................................................... 5

Fed. R. Evid. 403 .............................................................................. 6

# I.   STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

## A.   BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT

Appellant Mylique McFadden was the sole defendant named in a 3-count indictment filed in the District of South Carolina on July 8, 2025.

Count One alleged distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). JA011. Count Two alleged possession with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). JA011. Count Three also alleged possession with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). JA012.

Pursuant to the indictment and the cited code sections, the district court had jurisdiction over this case.

## B.   BASIS FOR JURISDICTION IN THE COURT OF APPEALS

28 U.S.C. § 1291 authorizes this Court to review final decisions of the federal district courts. A jury verdict is a final decision in a federal district court.

A final judgment in this matter was entered on October 28, 2025. JA435. A notice of appeal was filed on November 3, 2025. JA441. Based on the final judgment of the district court in this case and a proper and timely notice of appeal, this Court has jurisdiction over this matter.

## II.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  THE DISTRICT COURT VIOLATED McFADDEN'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY IMPROPERLY LIMITING HIS CROSS-EXAMINATION OF A COOPERATING WITNESS.

2.  THE EVIDENCE AGAINST McFADDEN WAS INSUFFICIENT TO CONVICT HIM ON COUNT 1 BECAUSE THE GOVERNMENT FAILED TO PROVE A DISTRIBUTION OF FENTANYL TO THE DECEDENT OR THAT FENTANYL WAS THE BUT-FOR CAUSE OF THE DEATH.

3.  THE GOVERNMENT'S EXPERT WITNESS ON NARCOTICS TRAFFICKING WAS NOT RELIABLE AND SHOULD NOT HAVE BEEN ADMITTED.

## III.  STATEMENT OF THE CASE

A federal jury convicted Mylique McFadden of one count of distributing fentanyl resulting in death and two counts of possession with intent to distribute marijuana. The Government claimed McFadden sold fentanyl to Matthew Barber at a gas station and that Barber died from that fentanyl within the hour. The conviction depended on two witnesses whose testimony McFadden was prevented from fully testing or that exceeded its permissible bounds: a cooperating witness whose sentencing exposure the district court placed largely off-limits, and a case agent who testified at once as a fact witness and a narcotics expert.

The victim in this case, Matthew Barber, met his girlfriend Danielle Breau while he was in the hospital detoxing from alcohol. JA077. They initially met in November of 2023, about six months before he died. JA091. She worked at the hospital and they continued their relationship after he left. Ms. Breau was in the medical field and was able to tell the jury that alcohol

can cause severe detox effects. JA091. She noted during their relationship that Barber easily suffered the effects of detox, often after just a few days of drinking. JA092. He went to rehab at least twice before his death. JA078. The last stint was about a month before his death. JA079.

Ms. Breau described a fast-moving, intense relationship that was often chaotic. JA092. The relationship was volatile because Barber often lied about his substance abuse and drank a lot. JA093. He would repeatedly get sober and relapse, often ending up in the hospital or detoxing. JA095. Barber often took Ms. Breau's prescription medication without permission, to the extent she started hiding it or taking it with her so he could not find it. JA096.

One of the drugs Barber would take from Ms. Breau was Klonopin. JA097. He took her Adderall. JA098-099. He was on steroids for a long time. JA099-100. Many times, he was dishonest with Ms. Breau about what he was doing and taking. JA100-101. He had overdosed at least once previously on fentanyl. JA102.

The weekend of his death, Ms. Breau came home to find Barber passed out from taking too much Klonopin as well as his own sleeping medicine, mirtazapine, trazodone, and Benadryl. JA103. In addition to blacking out from taking too much Klonopin, Barber was drinking the weekend of his death. JA105. That drinking was starting to affect Barber's health, both mental and physical. JA106-107.

The drinking continued throughout the weekend. In the early morning hours of the day he died, Ms. Breau sent Barber a text describing him as

passed out and she was unable to wake him up. JA108. He had continued a pattern of taking various drugs without supervision by a doctor. JA111.

On May 27, 2024, Memorial Day, Ms. Breau left Barber alone at her apartment while she went to visit her parents. JA079-080. They texted throughout the day. Around 6 p.m., Ms. Breau returned home and found Barber passed out. JA083-084. He was later declared dead.

Police used phone records to identify McFadden as a person Barber had been in contact with on the day of his death. JA377-378. They also had surveillance video footage showing Mylique McFadden's car meeting Barber in a gas station parking lot. JA388. After identifying McFadden as a suspect, law enforcement obtained a search warrant and seized his cell phones on July 8, 2024. JA135.

An arrest warrant was issued for Mylique McFadden on December 10, 2024, after the grand jury returned a 1-count indictment for distribution of fentanyl resulting in death. JA002-003. He was arrested by federal authorities on January 2, 2025 and arraigned the same day. JA003. McFadden was arrested again on July 1, 2025, for additional marijuana charges and his bond was revoked. JA005-006. The Government then obtained a three-count superseding indictment charging distribution of fentanyl resulting in death and two counts of possession with intent to distribute marijuana. JA011.

Before trial, the district court held a hearing on the admissibility of expert testimony from Investigator David "Joey" Gault and on the scope of trial evidence and admitted Gault as an expert in narcotics investigations

over McFadden's objection. The case was tried over three days in August 2025. At the close of the Government's case, McFadden moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the Government had failed to prove both an actual distribution to Barber and that fentanyl was the but-for cause of Barber's death; the district court denied the motion. McFadden did not testify and presented no evidence. The jury found McFadden guilty on all three counts and, by special interrogatory, found that the fentanyl caused Victim One's death. JA414-415.

McFadden renewed his motion for a new trial and a judgment of acquittal in writing. That motion was denied. The district court entered judgment and sentenced McFadden to 20 years in prison on October 28, 2025. JA436. McFadden timely noticed this appeal. JA441.

Because the specific issues raised on appeal are fact-dependent, counsel has included additional relevant facts in the respective argument sections for clarity.

## IV.   SUMMARY OF THE ARGUMENT

McFadden's convictions rest on evidence the defense was never permitted to test fully, or that should not have reached the jury in the form it did.

First, the district court denied McFadden his Sixth Amendment right to confront the Government's cooperating witness. Nigel Craig-Jackson, who was convicted of distributing fentanyl resulting in death and sentenced by the same judge who presided over McFadden's trial, supplied the only direct

evidence that McFadden sold fentanyl to the decedent. Yet the court, analyzing the question under Federal Rule of Evidence 403 rather than the Confrontation Clause, barred McFadden from asking about the specific penalties Craig-Jackson faced and avoided through cooperation, and even about the sentence he was then serving.

The jury then heard Craig-Jackson claim that he testified truthfully because he is "a good American citizen," while the concrete measure of his bias was withheld from them. Because the limitation left the jury without the information needed to assess a powerful incentive to please the Government, and because Craig-Jackson's testimony was neither cumulative nor independently corroborated, the error was not harmless beyond a reasonable doubt.

Second, the evidence was insufficient to sustain the death-results conviction on Count One. The Government proved no transaction and its own forensic pathologist, after testifying on direct that fentanyl was the but-for cause of death, conceded on cross-examination that the death could not necessarily be blamed on fentanyl in isolation, that several central-nervous-system depressants and significant coronary artery disease contributed, and that she could not say the decedent would not have died absent the fentanyl. On this record, no rational juror could find but-for causation beyond a reasonable doubt, as *Burrage* requires.

Third, the district court erred in admitting the case agent's expert testimony. Investigator Gault testified at once as the case agent and a narcotics expert, and his expert opinion that McFadden dealt fentanyl rested

on two ambiguous text messages he conceded were consistent with a misunderstanding. He repeatedly failed to offer proper methodology for his opinions. As this Court has held, an officer may not blur the line between fact and expert testimony or offer "expert testimony dressed in lay witness clothing" untethered from reliable methodology. The error supplied the only bridge from McFadden's conceded marijuana dealing to the charged fentanyl distribution and was not harmless.

## V. ARGUMENT

## 1. THE DISTRICT COURT VIOLATED McFADDEN'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY IMPROPERLY LIMITING HIS CROSS-EXAMINATION OF A COOPERATING WITNESS.

### Standard of Review

This Court often reviews the district court's limitation of cross-examination for abuse of discretion. *United States v. Ambers*, 85 F.3d 173, 175 (4th Cir. 1996). However, McFadden raised this issue as a Confrontation Clause violation, which triggers de novo review and requires the beneficiary of the error to show beyond a reasonable doubt that the error did not contribute to the verdict. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015).

## **Argument**

"A man has two reasons for what he does, a good reason and the real reason." This quote is of unknown origin but is often attributed to J.P. Morgan or Teddy Roosevelt. Regardless of who actually said it, the message rings true. A person's real motivation is rarely the one they claim.

Nowhere is that truer than the federal criminal justice system, where a favorable sentence often requires cooperating against other accused individuals to get to freedom. Here, the Court imposed such severe restrictions on counsel's ability to explore a witness's bias that the right to confront that witness was meaningless.

Nigel Craig-Jackson knew exactly how important it was to tell the Government what it wanted to hear, because he had already played the game once and had his sentence cut dramatically. But he did not tell the jury that he was testifying to get yet another cut to his sentence for selling someone fentanyl and causing their death. Instead, he told the jury he had been promised nothing for his testimony and was there to "[b]e an American and tell the truth." JA302. He kept referring back to that motivation throughout his testimony, "[b]ecause this is what an American citizen does: He tells the truth." JA306.

Even on cross-examination, Craig-Jackson kept trying to mislead the jury into thinking he was only testifying out of the goodness of his heart. When asked to differentiate all his previous lies from his current testimony, he responded:

> "Oh, because it was about me. This isn't about me. This is about being – this is actually about being a U.S. citizen. This is about showing change. See some people scared of that. People think they – they want to up they street cred and all this. No, this is about – completely about change."

JA334.

When specifically asked if he was testifying for a sentence cut, Craig-Jackson told the jury with a straight face he was testifying for the good of society:

> "...I'm just here to help out. If I get helped or not, I know my conscience would be clear. I actually did something right in my life for a change instead of doing something wrong...I thought about the greater – I thought about – I didn't think about myself in the situation. You know what I'm thinking about? I'm thinking about the greater good of people. People need people – like me, like, I'm not mad at myself for getting time in prison. You know what I'm mad at? I'm mad because I could have made better decisions."

JA338. He continued to tell the jury he was not testifying with the hope of receiving any benefit. JA341.

Craig-Jackson's statements distinguish this case from the other opinions discussing limitations on cross-examination. He repeatedly claimed his motivation for testifying was coming from the goodness of his heart. And there was little to challenge that, because all McFadden could do was reference that Craig-Jackson faced a severe penalty but got a break. He could not go into even general details, and the jury was left with the distinct impression that he was there to be a "good American citizen" as opposed to getting the time cut he was keenly aware the Government could give him.

In the face of these claims Craig-Jackson was repeatedly making, it was reversible error to limit the cross-examination to just the barest of general inquiries into his awareness of how powerful Government assistance could be in his case.

Cross-examination is the primary way a witness's credibility and testimony are challenged. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, guarantees the right of an accused to confront the witnesses against him. *Id*. As the Supreme Court has recognized:

> "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers."

*Id*. at 315-16 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). (Emphasis in original.) As this Court develops the law around cross-examination, it has not strayed far from that original purpose.

There are specific reasons why a trial court can limit cross-examination, including concerns about harassment, prejudice, confusion of the issues, witness safety, or repetitive and irrelevant interrogation. *Delaware v. Van Arsdall*, 475 U.S. 673, 683 (1986). At the same time, one of the most important functions of cross-examination is the exposure of a witness's motivation to testify. *Id*. These two competing interests are both important, but only one of them is protected by the Constitution.

This Court has long recognized how important it is for a defendant to inquire into the motivations of a testifying witness. The right of confrontation "…has as one of its most important aspects the right to cross-examine a hostile witness in order to undermine the credibility of the witness by highlighting the possible influence of bias on the testimony of the witness." *Hoover v. Maryland*, 714 F.2d 301, 305 (4th Cir. 1983).[1] The opinion recognized a trial court could limit cross to protect a witness's right against self-incrimination, prevent attempts to harass, humiliate, or annoy a witness, or ensure a witness's personal safety. *Id.* This Court went on to state that if those factors are not present, substantial limitation on a defendant's efforts to expose witness bias was constitutional error. *Id.*

The critical piece of cross-examination is the ability to question a witness about what they believe they will gain from testimony, regardless of what they will actually gain. "The likelihood that a prosecution witness is shading or even contriving testimony adverse to the defendant reasonably can be viewed as directly correlated with the perceived value of such testimony to the witness." *Id.*

This Court has typically upheld restrictions on cross-examination when the defendant was able to fully explore the subjective motive for testifying. *United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996). In *Ambers*, this Court approved the district court's restriction of detailed examination on the specifics of the sentencing guidelines. *Id.* The Court

---

[1] The *Hoover* Court was discussing a state-court defendant, but the constitutional implications are the same.

noted it would prevent distracting the jury over a technical analysis of the guidelines. *Id.*

In *United States v. Scheetz*, counsel was allowed to question witnesses about their maximum and minimum sentences, as well as the reduction they were hoping for. *United States v. Scheetz,* 293 F.3d 175, 184 (4th Cir. 2002). The district court in that case also gave the jury a detailed explanation of how the sentencing guidelines worked, including the concept of substantial assistance. *Id.* Again, the only real restriction on the defense was the prohibition on additional technical questions related to the application of the sentencing guidelines. This is not unreasonable, as there is a real risk they could confuse a jury.

*Scheetz* is an important opinion, because it post-dates *United States v. Cropp* and calls the utility of that opinion into question. In *Cropp,* this Court did not allow any quantitative questions at all but defended its position by citing both a First Circuit opinion and an unsupported fear of "jury nullification." *United States v. Cropp*, 127 F.3d 354, 358 (4th Cir. 1997). If *Cropp* ruled the issue, *Scheetz* would have been unnecessary. It is clear that a few years after *Cropp*, district courts were still allowing questioning about sentencing exposure when cross-examining a cooperating witness.

This is far more consistent with the Supreme Court's historic constitutional view of confrontation as set out in *Davis* and *Van Arsdall.* It honors both the text of the Sixth Amendment as well as the Nation's historical view of that Amendment. *Cropp* is an outlier. More importantly, it

does not address the specific testimony from Craig-Jackson, which squarely distinguishes this case and required more latitude on cross-examination.

Craig-Jackson did not just deny he was hoping for a sentence reduction. He repeatedly told the jury he was not testifying for his own benefit, but instead he was testifying based on a moral change in his life and a desire to live up to the ideals of a "good American citizen." Had a jury known he had already received significant benefits from the Government, his claims would have been exposed for the nonsense they were.

Instead, the jury was left being told he was facing a serious sentence and had not received that sentence. Without any further development, the jury had no concept of Craig-Jackson's clear understanding of how much he stood to gain from his cooperation in this case.

Because McFadden was unable to expose this bias, the jury did not understand how strong the motivation for Craig-Jackson to lie was. The district court's restrictions on cross-examination violated the Confrontation Clause. This Court should reverse that decision and allow McFadden to defend himself with the full range of his Confrontation Clause rights as guaranteed by the United States Constitution.

**2.** **THE EVIDENCE AGAINST McFADDEN WAS INSUFFICIENT TO CONVICT HIM ON COUNT 1 BECAUSE THE GOVERNMENT FAILED TO PROVE A DISTRIBUTION OF FENTANYL TO THE DECEDENT OR THAT FENTANYL WAS THE BUT-FOR CAUSE OF THE DEATH.**

## Standard of Review

McFadden concedes he has a heavy burden in convincing this Court there was insufficient evidence to sustain his conviction. *United States v. Savage,* 885 F.3d 212, 219 (4th Cir. 2018). This Court reviews the evidence de novo, and the guilty verdict must be upheld if it is supported by substantial evidence; that is, evidence that a reasonable finder of fact could accept as adequate and sufficient to support guilt beyond a reasonable doubt. *United States v. Williams,* 130 F.4th 177, 181-182 (4th Cir. 2025).

## Argument

**1.** **The jury could have only found fentanyl the but-for cause of death through speculation.**

The conviction on Count 1 had to rely on fentanyl as the but-for cause of the victim's death. *United States v. Burrage,* 571 U.S. 204, 210-218 (2014). To convict, the Government had to convince the jury beyond a reasonable doubt that the fentanyl killed Barber. Because that was not clear from the testimony, there was insufficient evidence for the conviction.

It was undisputed there were multiple substances in Barber's body at the time of his death, all of which were dangerous in combination. He had been on a serious binge, which had resulted in his blacking out over the weekend and becoming so intoxicated he could not be woken up in the 24 hours before his death.

The Government called Michael Lamb of NMS Laboratories in Pennsylvania to testify about toxicology. JA265. He was qualified as an expert in forensic toxicology. JA269. Lamb went through the various substances found in Barber's body. He started with his blood alcohol level which was .122. While he and the Government framed this level as "slightly" over the legal limit, it would have been nearly 50% over the legal limit for driving in every state in the United States, except Utah where it would be over double the legal limit.[2]

He then went through the other drugs found in Barber's blood, though he admitted it was "… really difficult to interpret the levels just by themselves without any context of the case." JA273. Trazodone was an anti-depressant found in Barber's blood. JA273. There was also mirtazapine found, another anti-depressant. JA273-274. He testified the concentration would have been therapeutic if it was properly prescribed. JA274.

Lamb also testified about fentanyl, reporting it was found at 8.1 nanograms per milliliter (ng/mL). JA274. Lamb said the concentrations

---

[2] https://www.cdc.gov/impaired-driving/about/index.html (last accessed May 26, 2026).

typically seen in therapeutic settings was not more than 3 ng/mL. JA274. There was also a fentanyl precursor found in Barber's blood. JA275.

Lamb found amphetamine in Barber's blood but testified it was not a high level. JA275. He could not tell if it was a prescribed level or a breakdown product of methamphetamine. JA275. Finally, he testified about clonazepam (also known as Klonopin) which was found in another therapeutic level if it were prescribed. JA275-276.

Lamb immediately conceded on cross-examination that he could not look at blood levels in a vacuum and make any determination as to whether they were fatal. JA276-277. He testified that opiate overdoses, as the government alleged occurred here, would have specific signs. JA277-278.

During cross-examination, for the first time, Lamb discussed the concept of post-mortem redistribution ("PMR"). Essentially, certain drugs are absorbed into the body's tissues and then re-enter the bloodstream after death. JA279. Drugs with a high lipophilicity are more likely to bind to tissues in the body and are more likely to undergo postmortem redistribution. JA279. Lamb agreed the blood concentration levels at death would not be the same as those around the time of the death. JA281.

Lamb testified one of his colleagues was the first person to publish about PMR and wrote an article that PMR had significant effects on determining blood levels of drugs, especially in fatalities. JA284. When Lamb's colleague did his study, PMR resulted in the fentanyl levels going from therapeutic to over 50 ng/ml. JA285.

Lamb also discussed the effects of the drugs found in Barber's blood. Someone who frequently took fentanyl could develop a very high tolerance. JA285-286. All the other drugs, except for the amphetamine, were classified as central nervous system depressants. JA286. They would have a "synergistic effect" which means their combined effects would be higher than their individual effects. JA289. Interestingly, Lamb also noted there was Narcan in Barber's system, which would have reversed opioid intoxication but had no effect on the other drugs found in his system. JA289-290.

The Government also called Dr. Grace Dukes. JA345. Dr. Dukes was qualified as an expert in forensic pathology. JA349. She testified her cause of death was the combined toxic effects of fentanyl, clonazepam, trazodone, mirtazapine, and alcohol. JA356. She testified that the high level of fentanyl explained Barber's death, but also said the other drugs were contributory and would have similar effects as the fentanyl. JA357. She testified her opinion to a reasonable degree of medical certainty was the other drugs would not have caused the death without the fentanyl. JA358. But that was not her final word on the subject.

Dr. Dukes described the clues someone might show that would reveal a cause of death, using powder around the nose or pills in the stomach as an example of how to determine an overdose. JA362-363. None of those objective clues were present in this case. JA363. She noted the 4-ANPP (fentanyl metabolite) found in the blood could have been either a precursor or a sign the body was breaking down fentanyl. JA364.

Dr. Dukes testified on cross that all the drugs found in the victim's body potentially contributed to the death. JA366. She described the fentanyl as "present at a well described lethal level." JA366. But after acknowledging the learned treatise *DiMaio's Forensic Pathology*, she agreed with a statement found in the book: "In the interpretation of results for postmortem toxicology, the two most important concepts for any death investigator are the drug concentrations should never be interpreted in a vacuum, and there is no such thing as a lethal drug concentration."[3] JA366.

Dr. Dukes agreed that toxicology results in isolation cannot be used to determine a fatal level. JA367. When confronted with the facts related to the 48 hours prior to the victim's death, including blackouts, severe withdrawal from previous drug and alcohol use, seizures, and ingesting numerous prescription drugs unmonitored, Dr. Dukes agreed the substances besides fentanyl could cause death. JA368. She also agreed that she could not exclude the other drugs as the cause of death independent of the fentanyl. JA371. She also agreed there were no traditional signs of an opiate overdose present in this case. JA371. Dr. Dukes concluded her testimony by admitting that the victim suffered from significant heart disease. JA372.

It is not at all clear that fentanyl was the cause of death in this case and certainly not clear it was the but-for cause. In fact, there were numerous other substances that could have caused this death. Heart disease was also

---

[3] The referenced book was Vincent J.M. DiMaio & D. Kimberley Molina, *DiMaio's Forensic Pathology* 477 (3d ed. 2021).

significant. That lack of certainty does not support the jury's verdict in this case. There was insufficient evidence fentanyl caused the death.

## 2. The jury could have only found McFadden distributed fentanyl to Barber through speculation.

Even if fentanyl could be blamed for the victim's death, there was no evidence McFadden provided fentanyl to the victim. It has long been the law in the Fourth Circuit that a jury verdict based on speculation alone cannot stand. *Call v. United States*, 265 F.2d 167, 172-73 (4th. Cir. 1959). As discussed extensively in the next section, there was an expert who offered an opinion that text messages between Barber and McFadden the day Barber died were related to the sale of "hard drugs" but he could not specifically claim they were related to fentanyl.

Additionally, the jury was shown video of a purported meeting between Barber and McFadden. While Nigel Craig-Jackson claimed McFadden told him much later it was a drug deal, that was not clear from the video. JA320-321. The federal case agent admitted during his testimony that you could not see any deal occur on the surveillance footage obtained by the Government.

The internet searches from McFadden's phone did not reference fentanyl. JA394. Barber often used Cash App[4] to pay for items. JA395. There was no record of this app being used to pay McFadden. JA396. There were no fingerprints obtained from the suspected bag the fentanyl came in. JA397.

---

[4] Cash App is an electronic exchange used to pay people. https://cash.app/

That bag was only tested just days before trial began. JA399. There was also additional fentanyl found in a different container. JA400.

In the six to eight months before his death, there were thousands of text messages, yet none involved drugs and none appeared to have involved McFadden. JA404-405. Barber also blacked out and was unable to wake up in the days before his death. JA405-406. Based on all this information, it is not at all clear that he obtained fentanyl from McFadden, and there is insufficient evidence to sustain the conviction on Count One in this case.

3.   **THE GOVERNMENT'S EXPERT WITNESS ON NARCOTICS TRAFFICKING WAS NOT RELIABLE AND SHOULD NOT HAVE BEEN ADMITTED.**

### Standard of Review

A district court's decision to admit expert testimony is reviewed for abuse of discretion. *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 632 (4th Cir. 2018). Such an abuse of discretion occurs when considering expert testimony if the district court makes either an error of law or bases its decision on a clearly erroneous factual finding. *Id*.

### Argument

The Government called a local drug agent, Gault, as an expert in narcotics investigations. McFadden filed a motion challenging the expert but

did not launch a general attack on a drug agent's ability to testify as an expert on the drug trade. JA019. Instead, he questioned whether Gault based his opinions on sufficient facts or data and whether he reliably applied the principles and methods to the facts of the case. JA023. The Government called Gault to explain the basis for his expert opinion. JA043.

Gault went through his law enforcement history, telling the court his long-running relationships with confidential informants was the source of much of his information. JA045. At one point, he testified that a statement asking whether a substance was cut with "fent" meant that McFadden was involved in the sale of fentanyl. JA053. While Gault candidly admitted he could not tell what drug was being discussed in the texts, he claimed to guess based on the purported context, the conversation, and the investigation. JA057.

Gault also testified there was no conversation in this case where someone asked for fentanyl; in fact, the only reference to fentanyl was someone specifically not wanting it. JA061-062. Gault conceded there were no other conversations he could testify to that involved fentanyl. JA062. While Gault found numerous conversations related to the sale of marijuana, he had no conversations related to the sale of fentanyl. JA063. After listening to Gault's pretrial testimony, McFadden initially expected most of his testimony would be admissible under this Circuit's precedent.

Gault was called as both a fact witness and an expert witness during the trial. The second time he was called, the Government sought to qualify

him as an expert in narcotics investigations. JA143. McFadden examined him on his qualifications before the judge ruled. JA144.

Gault testified he had previously testified as an expert in a federal case. JA144. Defense counsel had the transcript in that case and pointed out that he was not offered or qualified as an expert in that trial. More importantly, counsel asked Gault directly if he understood the parameters of the Federal Rules of Evidence and why he was able to offer an opinion in a case. JA145.

McFadden objected to Gault's testimony based on the lack of understanding of the role of expert witness. There was legitimate concern that his answers on voir dire made it unclear whether he could separate his role as a fact witness from his role as an expert witness. JA146-147. The district court allowed the testimony and qualified Gault as an expert in narcotics investigations over McFadden's objection. JA152-153.

During Gault's testimony, McFadden specifically objected when Gault arbitrarily testified the "100" and "60" worth of product worked out to be "harder drugs." JA157-158. Gault then tried to explain how he knew those two numbers could be tied to a specific type of drug.

Gault testified about controlled buys and admitted that the market price for drugs fluctuated like any other consumer market. JA158. While an accurate statement, this also cuts against his claim that the mere price of a substance without further context could identify the substance. While he explained that "60" and "100" were "representative of a drug transaction and what the buyer wants to purchase…" (JA160) he did not explain how this allowed him to identify the type of drugs. He also claimed it allowed him to

identify this as a drug transaction. This was exactly the issue McFadden had complained about; that his testimony as an expert would blur with his testimony as a fact witness. He specifically referenced circumstances he was familiar with from his investigation of this case. JA160.

Gault then testified about a number of text messages he got from McFadden's phone. McFadden objected to hearsay because none of the speakers were in court, but the objection was overruled. JA165-166.

Gault testified about a conversation two months before the death at issue in this case where there was a request from an unknown person for a "ball." JA170. He testified it was not a marijuana transaction, but when asked the basis for his opinion, he claimed "ball" referred to harder drugs but offered no explanation for the opinion. JA171.

He also testified to a conversation between McFadden and the same unknown person related to "fent." JA174. The unknown person was not asking for fentanyl (assuming that is what "fent" was referring to) but instead verifying the substance he bought did not contain "fent." There was no further communication after that question.

Gault also testified to an exchange between McFadden and an unknown person who asked for "clear water." JA176. Gault testified "clear water" was not marijuana and had always referred to methamphetamine in his experience. JA177. He offered very little foundation for that opinion. His testimony then went on for pages and pages describing marijuana deals. JA178-214. There were no references to fentanyl or any other drug besides marijuana.

On cross-examination, Gault admitted he was originally an investigator on McFadden's case and reached an opinion based on his review of the file. JA232-233. That opinion came before he was an expert in the case but was the same opinion. JA233.

Gault also conceded, contrary to his opinion the day before, "[a]ny amount of money can buy you any amount of drugs." JA235. Recognizing this was diluting the main point of his testimony, he then added that one should consider the context and facts, as opposed to just the number referenced. As his testimony continued, the fatal flaw in his opinion became apparent.

Gault claimed the "60" and "100" referenced hard drugs based on the context of the messages and the facts of the case. JA236. While he testified there were no messages indicating the victim was buying marijuana from McFadden, there were also no messages indicating he was buying any other drugs from McFadden. JA236. It was clear from Gault's answers his opinion was not based on any solid information, but just his guess that was consistent with the case the Government needed to prove.

Gault continued trying to add fentanyl to the case without any evidence of actual fentanyl. For example, he referenced a Google search history that he claimed involved fentanyl, when it did not. JA238. He also continued to put significant importance on the exchange with a person who did not want fentanyl as somehow supporting a fentanyl deal. JA239-240. Despite having specific contact information for the person involved in that deal, no one ever made any attempt to contact and question that person. JA240-241.

Gault went on to admit how imprecise coded drug language was and how it evolved over time. There are hundreds of slang terms for illegal drugs, according to the Drug Enforcement Administration ("DEA"). JA242. Language evolves over time and sometimes people use their own specific codes, making general terms hard to tie to any particular drug. JA243.

Interestingly, Gault had repeatedly claimed an "8-ball" or a "ball," which is 3.5 grams, was a specific reference to hard drugs. But he also admitted that McFadden had been stopped several times with 3.5 grams of marijuana. JA243. "Ball" is a reference to that 3.5 grams, but neither Gault nor any other person involved in this investigation ever asked the speaker who referenced a "ball" what he was talking about. JA243.

This was particularly important because McFadden pointed out, and Gault agreed, that there was no reference to fentanyl and no fentanyl was ever seen in surveillance or found in numerous searches (besides the one conversation ensuring a person did NOT receive fentanyl). JA246-251.

Gault then began offering new opinions on re-direct. For example, he claimed that drug dealers often carry multiple phones. JA254. Gault then, over McFadden's objection, offered the opinion that drug dealers often sell more than one particular type of drug. JA257-258.

What he could not do, as demonstrated through cross-examination, was get away from his prior testimony. Despite his insistence that "60" and "100" had to refer to hard drugs, there was no context to support that opinion. There was, however, context to link "60" to a strain of marijuana,

because the exchange from which that reference came specifically discussed marijuana. JA261.

Gault acknowledged that McFadden had sent numerous messages over the telephone regarding marijuana sales. JA262-263. But there were no similar messages about any other drugs. JA263. Gault and the Government tried to frame the lack of messages related to hard drugs as a result of the death investigation, despite there being almost no reference to hard drugs in the messages previous to the investigation. JA263. In fact, Gault's final answers are the most telling. The only two references to hard drugs were questions from unknown people that went unanswered. JA263-264. Gault agreed those exchanges could possibly mean there had been a misunderstanding and McFadden was not selling any hard drugs. JA264.

Over hours of testimony, Gault reached the opinion McFadden was a drug dealer who sold hard drugs. But the barest look at his opinions reveals they are unsupported and fraught with flaws. He essentially took a few messages out of thousands and reached a conclusion those messages did not support. There was little question McFadden sold marijuana; defense counsel conceded that in his opening argument. But he vehemently disputed fentanyl sales and there was no evidence of those sales. Gault's opinions to the contrary should not have been admitted.

Those opinions were not supported by reliable methodology. This Court has rejected very similar testimony for the same reason. In *United States v. Johnson*, the Court considered a drug agent offering lay testimony. *United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010). The agent's

testimony relied on his view of other conversations between the parties. *Id.* at 290. The interpretations he offered appeared to have more context than the ones in this case.

While the *Johnson* opinion primarily turned on the admissibility of lay opinion testimony, the Government also argued that the error was harmless because it could have been properly offered as expert testimony. *Id.* at 294. This Court disagreed, noting that it had set out an appropriate way to qualify narcotics officers as drug experts. *Id.* (citing *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007)).

*Wilson* took issue with officers testifying about the meaning of terms that needed no explanation, as well as not adequately explaining methodology in reaching a questionable interpretation. *Wilson*, 484 F.3d at 278. In *Johnson*, the Court found that while the agent claimed expertise in drug jargon and the drug trade generally, he provided no methodology or guiding principles to explain how he was decoding phone communications. *Johnson*, 617 F.3d at 294.

The same issue exists here. Throughout Gault's testimony he failed to explain his reasoning for his interpretation of the terms he was explaining. When he explained it, there was very little to support his explanation. He often conflated terms that refer to weight with terms that refer to substances, without any explanation of why he was reaching those conclusions.

The greatest concern, however, is that Gault did not seem to reach conclusions that made sense on the scant evidence he did offer in support of his opinions. He offered no evidence to support the term "ball" being related

to a specific type or even class of drugs. He did not explain how he determined a vague text exchange with numbers had to refer to hard drugs as opposed to marijuana, which he had testified was also related to the exact same numbers. The complete lack of methodology renders his opinion inadmissible and should have been excluded.

Gault's testimony was also flawed because he was both a fact witness and expert witness. While that is not generally an outright bar, in this case it was clear he was mixing his role as an investigator with his role as an expert.

Gault candidly admitted he did not understand the parameters of the Rule allowing him to offer an opinion as an expert. JA145. McFadden objected to his testimony because he was the case agent in the death investigation long before the federal indictment or trial. JA145. There was a real concern he would not be able to separate the two roles. JA148. The Government responded by explaining his fact testimony and expert testimony were temporally separated.

But that separation did not solve the "dual role" problem that was so clear in this case. This Court vacated a conviction based on dual role testimony when it found prejudice arising from an agent testifying as both a fact witness and an expert witness. *United States v. Garcia*, 752 F.3d 382, 384 (4th Cir. 2014). The Court based its opinion on errors "infect[ing] the entire trial" much like here. The result in this case should be the same.

The *Garcia* Court recognized the importance of making sure an expert was testifying based on experience and expertise, as opposed to knowledge learned during the investigation of the case. *Id*. at 387. Like McFadden's case,

the error in the *Garcia* case stemmed from the expert testimony blurring with the fact testimony. The *Garcia* expert relied on her knowledge of the investigation to support her opinions, resulting in improper influence on the jury and depriving the defendant of a fair trial. *Id.* at 392.

This Court has discussed various ways a trial court can safeguard against improper dual role testimony, including separation of testimony, cautionary instructions, requiring a proper foundation, or requiring counsel to ground the question in fact or expertise. *Id.* While the Government certainly did its best here not to allow the roles to cross, Gault was unable to separate his expert testimony from his fact testimony.

For example, Gault admitted he reached an opinion regarding the case as the case investigator, before he was selected to serve as an expert witness. JA232-233. He also based his opinion on the incident report and the investigators that were handling the case with him. JA237.

Gault referenced other evidence that supported his opinion, though he misstated the evidence. For example, he claimed there was a search history on McFadden's phone that referenced fentanyl, though he admitted the search did not relate to fentanyl. JA238-239. He also stated his opinion a text message was discussing fentanyl, despite there being no mention of fentanyl, was based on "the facts of this case" which is a clear reference to information he gained as an investigator. JA235-236.

There was no evidence McFadden sold fentanyl. On the contrary, he was clearly a small-time marijuana dealer. But that would not support a conviction that required him to have sold fentanyl to the victim. Gault was

an investigator in the case and long before he was named as an expert, he was investigating the case as a drug-related death. The wealth of information pointing to marijuana sales did not help that theory. There was no evidence of fentanyl sales. Throughout his testimony, Gault tried to connect McFadden to fentanyl or hard drugs. But the lack of reliable foundation for those opinions makes it clear he was simply relaying this theory as an investigator under the guise of expert testimony. This Court has cautioned against that and reversed cases for that error. The result here should be the same.

## CONCLUSION

The conviction in this case should be reversed for lack of evidence, or in the alternative, vacated and remanded so that McFadden can receive a fair trial.

## STATEMENT REGARDING ORAL ARGUMENT

Based on the numerous important issues present in this case, the complexity of the fact pattern, and the lack of recent and clear case law to guide the Court, McFadden believes oral argument would aid the Court in reaching a decision and help clarify the law in the areas argued in this brief.

Respectfully submitted,

**_s/ Joshua Snow Kendrick_**
Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, SC 29606
(864) 760-4000
Josh@KendrickLeonard.com

May 29, 2026
Greenville, South Carolina

# CERTIFICATE OF COMPLIANCE

1.	This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,387 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.	This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

*s/ Joshua Snow Kendrick*

Joshua Snow Kendrick

Counsel for Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2026, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Joshua Snow Kendrick*

Joshua Snow Kendrick

Counsel for Appellant